## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> CHANCE BARROW, <br><br> Defendant. | Criminal No. 20-127 (CKK) |

## MEMORANDUM OPINION
(August 13, 2021)

After an eight-day trial, a jury unanimously convicted Chance Barrow ("Defendant") of two counts of wire fraud and one count of concealment of material facts. Defendant's trial took place during the COVID-19 pandemic, an ongoing national public health emergency. Throughout the trial, the Court adhered carefully to health and safety protocols developed for the United States District Court for the District of Columbia ("District Court") in consultation with public health experts. The Court also adopted measures authorized by the Judicial Conference of the United States and Chief Judge Beryl A. Howell to ensure public access to Defendant's trial, including by providing an overflow courtroom from which individuals authorized by the Court could watch a live-stream video of the trial and by offering a public telephone line from which members of the public could listen to the proceedings.

Defendant now seeks to overturn the jury's unanimous verdicts and obtain a new trial, contending that he was deprived of his Sixth Amendment right to a public trial based on non-specific and speculative allegations that the Court's technology malfunctioned at various points during the trial. In so doing, Defendant requests extensive discovery from the District Court, in a fishing expedition to substantiate his vague claims of technological shortcomings. Upon review

of the pleadings,[1] the relevant legal authority, and the record as a whole, the Court **DENIES** Defendant's [143] Motion for a New Trial, finding that there was no infringement on his right to a public trial.

## I.   BACKGROUND

For more than a year, the COVID-19 pandemic has drastically changed daily life.  By the time Defendant's counsel delivered his opening argument, COVID-19 had claimed more than 600,000 American lives and caused millions more hospitalizations.[2]  The District of Columbia had been operating under a public health emergency and a public emergency since March 11, 2020.[3] Although a mass vaccination campaign had steadily progressed in this jurisdiction and others

---

[1] The Court's consideration has focused on the following:
- Defendant's Motion for a New Trial ("Def.'s Mot."), ECF No. 143;
- United States' Opposition to Defendant's Motion for a New Trial ("Gov.'s Opp'n"), ECF No. 146;
- Defendant's Reply to the United States' Opposition to Motion for a New Trial ("Def.'s Reply"), ECF No. 147; and
- United States' Supplemental Briefing in Opposition to Defendant's Motion for New Trial ("Gov.'s Suppl. Br."), ECF No. 148.

[2] *See* Katerina Ang et al., *United States Surpasses 600,000 Coronavirus Deaths*, Wash. Post, June 16, 2021, https://www.washingtonpost.com/nation/2021/06/16/coronavirus-covid-live-updates-us/; Scott Neuman, *The U.S. Has Hit 600,000 COVID Deaths, More Than Any Other Country*, Nat'l Public Radio, June 15, 2021, https://www.npr.org/sections/coronavirus-live-updates/ 2021/06/15/1006186695/the-u-s-has-hit-600-000-covid-deaths-more-than-any-other-country; *see also Provisional COVID-19 Death Counts by Week Ending Date and State*, Ctrs. for Disease Control & Prevention, https://data.cdc.gov/NCHS/Provisional-COVID-19-Death-Counts-by-Week-Ending-D/r8kw-7aab (last visited Aug. 13, 2021).

[3] *See* Gov't of the Dist. of Columbia, Mayor's Order 2020-045, Declaration of Public Emergency: Coronavirus (COVID-19), Mar. 11, 2020, https://mayor.dc.gov/sites/default/files/dc/sites/mayor mb/release_content/attachments/MO.DeclarationofPublicEmergency03.11.20.pdf.  The public health emergency (but not the public emergency) ended in the District of Columbia on July 24, 2021, well after the conclusion of Defendant's trial.  *See* Gov't of the Dist. of Columbia, Mayor's Order 2021-095, End of Public Health Emergency and Extension of Public Emergency, July 24, 2021, https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/Ma yors-Order-2021-096.pdf.

nearby,[4] "more aggressive and much more transmissible" variants emerged in the United States, requiring continued vigilance to curb the disease's spread.[5]

    As with millions of other workplaces, "emergency conditions have materially affected and will materially affect the functioning of the federal courts generally."[6] Crowded courtrooms with tightly-packed jury boxes and galleries present a grave public health risk because:

> SARS-CoV-2 [the virus causing COVID-19] spreads easily from person-to-person when people are in close contact, mainly through respiratory droplets produced when an infected person coughs, sneezes, or talks. To a less extent, the virus can also spread by people who touch contaminated surfaces or objects such as handrails and doorknobs, then touching their eyes, noses, or mouths without washing their hands first.
>
> People with COVID-19 may not know that they are spreading it. People who are infected with the virus that causes COVID-19 can spread it before they become ill. Some people who are infected might not exhibit symptoms, but can spread the virus to other people. COVID-19 can be serious, especially for older adults and people who have underlying medical conditions like heart or lung disease or diabetes.[7]

    These public health risks prompted the federal judiciary to radically transform its daily operations. In this jurisdiction, Chief Judge Howell has issued a series of orders governing the

---

[4] *See* Jenna Portnoy et al., *Washington region very close to meeting Biden's July 4 vaccination goal*, Wash. Post, June 4, 2021, https://www.washingtonpost.com/local/dc-maryland-virginia-vaccine-covid-july-4/2021/06/04/f5704b8e-c48b-11eb-8c18-fd53a628b992_story.html.

[5] *See* Emily Anthes, *The Delta Variant: What Scientists Know*, June 22, 2021, N.Y. Times, https://www.nytimes.com/2021/06/22/health/delta-variant-covid.html (quoting Dr. Rochelle P. Walensky, director of the Centers for Disease Control and Prevention).

[6] *In Re: Use of Video Teleconferencing and Teleconferencing for Certain Criminal and Juvenile Delinquency Proceedings*, Standing Order No. 20-17 (BAH) (D.D.C. Mar. 39, 2020) at 1 n.2 (quoting Memorandum, dated March 29, 2020, from Jim Duff, Director of the Administrative Office of the Courts, Re: Update on CARES Act Provisions for Criminal Proceedings at 1).

[7] *COVID-19 (Coronavirus)*, U.S. Dep't of Health & Human Servs., https://www.hhs.gov/immunization/diseases/covid/index.html (last visited Aug. 13, 2021).

District Court's operations during the pandemic.[8]  Effective March 13, 2020, Chief Judge Howell and Chief Judge Sri Srinivasan of the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") restricted access to the E. Barrett Prettyman Courthouse and the William B. Bryant Annex (the "Courthouse") to "judges, court staff, members of the media, and visitors with official business with the courts."[9]  Access to the Courthouse remained restricted through Defendant's trial in June 2021.[10]

As of March 2020, the Judicial Conference of the United States "temporarily approved the use of video and teleconferencing for certain criminal proceedings . . . during the COVID-19 national emergency."[11]  Consistent with the Judicial Conference's approval, Chief Judge Howell authorized courts in this jurisdiction to conduct certain criminal proceedings by video or teleconference.[12]  With Defendant's consent, all but one of his pre-trial status hearings in this case

---

[8] The Notices and Standing Orders, as well as the District Court's Continuity of Operations Plan During the COVID-19 Pandemic ("COOP Plan") and its appendices cited in this Memorandum Opinion are available at https://www.dcd.uscourts.gov/coronavirus-covid-19-response-infor mation-and-announcements (last visited Aug. 13, 2021).

[9] *See* Notice – Restricted Access (March 13, 2020); *In re: Restrictions on Courthouse Visitors*, Standing Order No. 20-8 (BAH) (D.D.C. Mar. 13, 2020).

[10] *See In re: Modified Restrictions on Access to Courthouse During the COVID-19 Pandemic*, Standing Order No. 21-20 (BAH) (D.D.C. Apr. 2, 2021) ("Standing Order 21-20") at 4 ("[E]ffective April 5, 2021, access to the Courthouse is restricted to judges, court staff, other government employees working in the Courthouse, jurors, members of the media, attorneys, parties, and other persons with official business before the Courts.").

[11] *See Judiciary Authorizes Video/Audio Access During COVID-19 Pandemic*, U.S. Courts, Mar. 31, 2020, https://www.uscourts.gov/news/2020/03/31/judiciary-authorizes-videoaudio-access-during-covid-19-pandemic.

[12] *See In re: Use of Video Teleconferencing and Teleconferencing for Certain Criminal and Juvenile Delinquency Proceedings*, Standing Order No. 20-17 (BAH) (D.D.C. Mar. 30, 2020) ¶¶ 6, 7 (citing CARES Act, Div. B, Title V § 15002(b)(1), (2)).

were held by videoconference.[13]  *See* Minute Order (Sept. 15, 2020); Minute Order (Nov. 6, 2020);

Minute Order (Dec. 22, 2020); Minute Order (Jan. 21, 2021); Minute Order (Feb. 23, 2021);

Minute Order (Mar. 16, 2021); Minute Order (Apr. 23, 2021); Minute Order (May 20, 2021);

Minute Order (June 7, 2021); Minute Order (June 10, 2021).  Counsel appeared in person for the

June 10, 2021 status hearing, but Defendant appeared by Zoom videoconference.  *See* Minute

Order (June 10, 2021).

Moreover, beginning on March 16, 2020, Chief Judge Howell, in consultation with her

colleagues, the United States Attorney's Office, the District of Columbia Federal Public Defender,

and other defense counsel, ordered that *all* jury trials—including criminal trials—be postponed to

protect the health and safety of the public, courthouse staff and visitors, litigants, and counsel.[14]

One year later, Chief Judge Howell authorized the "limited resumption of jury trials" as of

March 15, 2021 under "stringent restrictions and safety precautions."  *In re: Limited Resumption*

---

[13] As described in greater detail *infra*, the Court also held an in-person "walk-though" of the voir dire and trial procedures on June 11, 2021.  *See* Hr'g Tr. (June 10, 2021) at 6:1-5; 67:21-24, ECF No. 115.

[14] *See In re: Court Operations in Exigent Circumstances Created by the COVID-19 Pandemic*, Standing Order No. 20-9 (BAH) (D.D.C. Mar. 16, 2020) at 3 (postponing trials until April 17, 2020); *In re: Extension of Postponed Court Proceedings in Standing Order No. 20-9 and Limiting Court Operations in Exigent Circumstances Created by COVID-19 Pandemic*, Standing Order 20-19 (BAH) (D.D.C. Apr. 2, 2020) at 2–3 (postponing trials until June 11, 2020); *In re: Further Extension of Postponed Court Proceedings in Standing Order No. 20-9 and Limiting Court Operations in Exigent Circumstances Caused by COVID-19 Pandemic*, Standing Order 20-29 (BAH) (D.D.C. May 26, 2020) at 3–4 (postponing trials until August 1, 2020); *In re: Third Extension of Postponed Court Proceedings Due to Exigent Circumstances Caused by COVID-19 Pandemic*, Standing Order 20-62 (BAH) (D.D.C. July 9, 2020) at 2–3 (postponing trials until September 8, 2020); *In re: Fourth Further Extension of Postponed Court Proceedings Due to Exigent Circumstances Caused by COVID-19 Pandemic*, Standing Order 20-68 (BAH) (D.D.C. Aug. 10, 2020) at 2–3 (postponing trials until November 9, 2020); *In re: Fifth Extension of Postponed Jury Trials Due to Ongoing Exigent Circumstances Caused by COVID-19 Pandemic*, Standing Order 20-89 (BAH) (D.D.C. Nov. 6, 2020) at 3–5 (postponing almost all trials until January 11, 2021); *In re: Sixth Extension of Postponed Jury Trials Due to Ongoing Exigent Circumstances Caused by COVID-19 Pandemic*, Standing Order No. 20-93 (BAH) (D.D.C. Dec. 17, 2020) at 5 (postponing all civil and criminal jury trials until March 15, 2021).

*of Criminal Jury Trials in Light of Current Circumstances Relating to the COVID-10 Pandemic*,
Standing Order No. 21-10 (BAH) (D.D.C. March 5, 2021) ("Standing Order No. 21-10") at 1–2.
Citing improvements in the rate of vaccinations and the decreasing number of new COVID-19
cases in the District of Columbia and neighboring jurisdictions, Chief Judge Howell ordered that
"urgent" criminal jury trials could proceed, subject to strict health and safety protocols that
"prioritize[ ] the health and safety of all trial participants." *Id.* at 2, 4; *see also* Standing Order No.
21-20 at 3.  These protocols were "guided by advice from the Centers for Disease Control and
Prevention ("CDC") and other public health authorities, which continue to recommend that
precautions be employed, including masking and social distancing, to reduce the possibility of
exposure to the COVID-19 virus and to combat the spread of the virus."  Standing Order No. 21-20
at 2.  The Court next describes these protocols, as they were implemented with respect to
Defendant's trial, which took place from June 14, 2021 until June 24, 2021.

Throughout Defendant's trial, all participants were required to wear face masks covering
their noses and mouths, in accordance with longstanding CDC guidance and applicable Standing
Orders.  *See id.* at 3 (requiring the "use of masks covering the nose and mouth at all times while
in public areas of the Courthouse, including courtrooms, hallways, restrooms and elevators").  The
Court permitted counsel (who confirmed that they were fully vaccinated) to remove their face
masks only when speaking.  The Court also permitted prospective jurors and witnesses to remove
their face masks when they were speaking (during voir dire or testimony) if they were comfortable
doing so, noting that they were separated from others in the courtroom by at least six feet and
shielded by plexiglass barriers.  *See, e.g.*, Trial Tr. (June 14, 2021 A.M.) at 50:18–23, ECF No.
149; Trial Tr. (June 21, 2021 A.M.) at 29:24–30:1, ECF No. 157.

Jury selection required the use of multiple courtrooms to ensure that prospective jurors could maintain an adequate distance from others in the courtroom.  *See* Standing Order No. 21-10 at 4 ("The need to maintain proper health and safety protocols, including social distancing, necessarily limits the Court's capacity to conduct trials.  The Court anticipates that each trial will require the use of multiple courtrooms, including the Ceremonial Courtroom for jury selections.").  The Court conducted group questioning of two separate venire panels in the Ceremonial Courtroom, which is significantly larger than courtrooms ordinarily used for trial.  Prospective jurors sat in marked seats, spread throughout the jury box and gallery of the Ceremonial Courtroom.[15]  Because this distancing limited the number of prospective jurors who could be seated in the Ceremonial Courtroom at the same time, the Court conducted two separate sessions of general questioning: the first, which was held on June 14, 2021, *see* Trial Tr. (June 14, 2021 A.M.) at 2:1–50:4, ECF No. 149, included a panel of 30 prospective jurors; the second, which was held on June 16, 2021, *see* Trial Tr. (June 16, 2021 A.M.) at 50:19–87:15, ECF No. 153, included a panel of 20 additional prospective jurors.

After each session of general questioning, the presiding judge, counsel for both parties, and Defendant re-located to a nearby courtroom to conduct individual voir dire.  To maintain appropriate social distancing, only one prospective juror at a time was brought into the courtroom through a designated entrance.  Each prospective juror sat in an assigned seat equipped with a

---

[15] The location of each seat was determined after consultation with health and safety experts, who conducted smoke tests to analyze the courtroom's air flow.  *See* COOP Plan at 5; *see also* U.S. Courts, *Smoke Tests Protect Courtroom Air From COVID-19* (Mar. 4, 2021), https://www.uscourts.gov/news/2021/03/04/smoke-tests-protect-courtroom-air-covid-19 (providing video of smoke tests being conducted in the Ceremonial Courtroom by fluid dynamics expert).

microphone in the jury box (rather than at the witness stand), which was shielded by a plexiglass screen.

Once the jury was selected, the trial was held in Courtroom 28A (the "Courtroom"), which was reconfigured to "ensure physical distancing of at least 6-feet," while also "optimiz[ing] sight lines to the extent possible and consistent with health and safety protocols."  COOP Plan, App'x 8 ¶¶ (2)(d)(i), (iii).[16] As with the courtrooms used for voir dire, the Courtroom was "retrofitted with plexiglass."  Standing Order No. 21-10 at 4.  Large plexiglass screens were placed on the front and the sides of the desks of the presiding judge, courtroom deputy clerk, court reporter, and law clerk.  Counsel tables were outfitted with plexiglass dividers between each seat and on the sides of each seat.  Counsel, the defendant, the presiding judge, and the court reporter were each provided with a wireless intercom device to obviate the need for counsel to approach the bench to conduct bench conferences.  *See* COOP Plan, App'x 8 ¶ (2)(c)(vi).

Jurors sat spread throughout the gallery of the courtroom in demarcated seats, rather than in the jury box.  *See id.* ¶¶ (2)(d)(i), (iii).  In the past, jurors generally had the benefit of built-in monitors in the jury box to view published exhibits.  Because jurors instead sat in the gallery, two large 50-inch television screens were set up at the front of either side of the gallery to allow members of the jury to view the published exhibits.  Moreover, jurors deliberated in a separate courtroom, rather than in a jury conference room, to allow them to maintain an appropriate distance during deliberations.  *See id.* ¶ (2)(e)(ii).

Instead of sitting directly next to the judge in the witness stand (which would not have ensured a distance of at least six feet), witnesses sat in the front row of the jury box, in the seat

---

[16] All citations to Appendix 8 of the COOP Plan refer to the version issued on March 4, 2021, which is available at the link cited *supra* note 8.

closest to the gallery, where the jurors were seated.  This designated witness seat was equipped

with a microphone and a computer monitor for witnesses to view exhibits.  A plexiglass screen

was wrapped around the corner of the jury box to shield the witness from counsel and from the

jury in the gallery.  A podium outfitted with plexiglass was set up between the witness in the jury

box and counsel table, from which the attorneys questioned the witnesses.

Consistent with applicable Standing Orders, these health and safety measures limited the

people in the courtroom to those directly participating in the trial.[17]  *See* Standing Order No. 21-20

at 3 (indicating that the District Court would "continu[e] to limit the number of individuals in

courtrooms and other spaces within the Courthouse to ensure appropriate social distancing at all

times").[18]  Accordingly, an overflow courtroom was provided for members of Defendant's family

and the public to watch the trial proceedings.  *See id.* at 4 ("[A]s space permits, consistent with

health and safety measures, limited numbers of members of the public may be granted entry to the

---

[17] Defendant incorrectly suggests that, had the Court anonymously polled the jurors to ask about their vaccination status, it would not have been necessary to maintain physical distancing and would have allowed members of the public to enter the Courtroom because the jurors would be seated in the jury box.  *See* Def.'s Mot. at 5.  That is simply not the case.  The Court strictly adhered to the social distancing protocols developed by the District Court, and would *not* have deviated from them, even if the Court had conducted such a poll and determined that all jurors were vaccinated.  *See* Trial Tr. (June 17, 2021 A.M.) at 106:17–107:1, ECF No. 155 (considering sending a note to the jury to inquire anonymously about vaccine status, and noting "if they are [vaccinated], whether they have issues about wearing masks," but explicitly noting "*I wouldn't change the 6-feet business. They'd still sit that way. I'm not taking chances that there's some other problem.*" (emphasis added)).  The purpose of any such poll would have been to convey to the jury that if all members were vaccinated, they could consider removing their masks during their deliberation.

[18] *See also* Frequently Asked Questions ("FAQs") About Resumption of Criminal Trials During Period of March 22 to August 23, 2021, U.S. District Court for the District of Columbia at 1, available at https://www.dcd.uscourts.gov/coronavirus-covid-19-response-information-and-announcements (last visited Aug. 13, 2021) ("Subject to the presiding judge's discretion, generally the main trial courtrooms may accommodate, consistent with social distancing requirements, the presiding judge, the courtroom deputy, a court reporter, two law clerks; up to two attorneys at each counsel table, including the defendant at defense table and case agent at the government's table; two deputy Marshals, and fourteen jurors.").

Courthouse for the purpose of observing live video feeds of ongoing trials from dedicated courtrooms or other spaces."); COOP Plan, App'x 8 ¶ (2)(a) (noting that "[a]dditional courtrooms will be designated . . . to allow limited numbers of members of the public and media to observe trial proceedings via a video feed at the discretion of the presiding Judge.").[19]

Because access to the Courthouse otherwise remained restricted to "judges, court staff, other government employees working in the Courthouse, jurors, members of the media, parties, and other persons with official business before the Courts," Standing Order No. 21-20 at 4, the Court directed both parties to provide a list of names of individuals seeking to observe the trial from the overflow courtroom. The Court authorized all individuals whose names were submitted by Defendant or his counsel to enter the Courthouse to watch the trial from the overflow courtroom. The Government did not request access for anyone other than members of its trial team.

The overflow courtroom was equipped with a 50-inch television screen facing the gallery, in addition to two 15-inch computer monitors, one on each counsel table. *See* Ex A, Image 1. During the trial, each of these screens was set up in a split-screen view with four quadrants displaying (1) the presiding judge; (2) both counsel tables and part of the gallery; (3) the testifying

---

[19] Information about seating arrangements for family members was also readily available on the District Court's website:

> *Will seats be reserved in the courtroom for a defendant's family and friends, or for other members of the public?* No. The gallery, where members of the public would ordinarily be seated, will be occupied by the jury. If a defendant has friends or family that wish to observe trial proceedings, they are encouraged to call in to the public access telephone line. Alternatively, space permitting, a small number of observers will be able to view a live video stream of the proceedings in a separate courtroom designated for that purpose.

FAQs, *supra* note 18, at 3.

witness; and (4) published exhibits.[20]  *See* Ex. A, Image 2.  A member of the Court's information technology staff who specializes in courtroom technology was present in the overflow courtroom for the majority of each day to monitor the audio and video feed.[21]

In addition to providing an overflow courtroom, the Court maintained a public telephone line for members of the public to call and listen to the proceedings.[22]  The public line was opened by the Courtroom Deputy Clerk on each morning of trial and left open for the duration of that day's proceedings.  Ordinarily, criminal proceedings are *not* available by a public telephone line; the public phone line was available only because of authorization by the Judicial Conference of the United States and applicable Standing Orders in light of the ongoing public health emergency.[23]  *See, e.g.*, Standing Order No. 21-20 ("In addition [to an overflow courtroom], public

---

[20] During voir dire, the screens in the overflow courtroom displayed only a single view of the Ceremonial Courtroom or the courtroom used for individual voir dire.  Both of these courtrooms are located in the E. Barrett Prettyman Courthouse, whereas the courtroom in which the trial was held was located in the William B. Bryant Annex, which has more advanced technological adaptations.

[21] The courtroom technology specialist sat in the desk ordinarily occupied by the courtroom deputy clerk, and had a dedicated computer screen to monitor the live feed of the Courtroom in which the trial was taking place.  *See* Ex. A, Image 3.

[22] *See COVID-19 Emergency Public Access Teleconference Information for Judges*, U.S. District Court for the District of Columbia, https://www.dcd.uscourts.gov/covid-19-emergency-public-access-teleconference-information-for-judges (last visited Aug. 13, 2021).

[23] As explained in the District Court's COOP Plan:

> Judicial Conference policy generally prohibits the broadcasting of proceedings in federal district courts . . . and Federal Rule of Criminal Procedure 53 prohibits "the taking of photographs in the courtroom during judicial proceedings or the broadcasting of judicial proceedings from the courtroom."  The Executive Committee of the Judicial Conference approved a temporary exception to the Judicial Conference policy to allow a judge to use teleconference technology to provide the public and media audio access to court proceedings while public access to federal courthouses is restricted due to COVID-19, in light of the CARES Act.

COOP Plan at 8 n.11 (internal citations omitted).

access to the audio of all court proceedings is continuing to be provided over dedicated public access lines.").

Defendant's trial was the second criminal jury trial to be conducted in the District Court pursuant to these health and safety protocols.  Accordingly, to ensure that the trial would run smoothly and that the parties were familiar with the health and safety protocols, the Court held a "walk-through" on June 11, 2021, during which the presiding judge personally escorted counsel for both parties and Defendant to each of the courtrooms that would be used during voir dire and the trial, so that they could view each configuration and ask questions about the COVID-19 protocols.  *See* Minute Order (June 7, 2021); Hr'g Tr. (June 10, 2021) at 3:23–4:11, ECF No. 115; Hr'g Tr. (June 7, 2021) at 30:6–9, ECF No. 114.  The Court also directed the parties to arrange a separate meeting with the courtroom technology specialist (who was also present during the walk-through) to learn how to use the intercom system and to ensure that any technology they elected to use during the trial was compatible with the systems available in each courtroom.  *See* Minute Order (June 2, 2021).

Despite these efforts, Defendant's trial was not without "glitches."  Def.'s Mot. at 8.  For example, during the general questioning of the first venire panel on the first morning of trial, the Court was alerted that the public telephone line was not capturing audio from the Ceremonial Courtroom.[24]  *See* Trial Tr. (June 14, 2021 A.M.) at 9:17–10:13, ECF No. 149.  Although the Court initially proposed proceeding with reading group questions, it instead stopped, and did not resume reading questions until it had confirmed that the audio on the public line and in the overflow

---

[24] During proceedings in the Ceremonial Courtroom, the audio feed for the public telephone line and the courtroom were the same.  *See* Trial Tr. (June 14 A.M.) at 15:13–20, ECF No. 149.  For proceedings in other courtrooms, the audio feed into the overflow courtroom came directly from the courtroom in use, not from the public telephone line.

courtroom was functioning.  *Id.* at 11:6–15:20.  The trial transcript reflects that this was the *only* time during trial that the Court was alerted of *any* outage on the public telephone line.

On the second day of voir dire, Defendant's counsel notified the Court that one individual whose name had been submitted to gain access to the Courthouse to watch the trial from the overflow room "tried to get in and [was] told by security that they didn't have a list or didn't have names."  Trial Tr. (June 15, 2021 A.M.) at 114:15–19, ECF No. 151.  Defendant's counsel did not indicate that this individual was unable to enter the Courthouse.  The Court responded that it had provided the list to the appropriate member of the District Court staff, but that it would "double-check" that the list had been distributed to court security staff.  *Id.* at 114:20–115:12.  Again, the trial transcript reflects that this was the *only* time during trial that any issue with an individual gaining access to the Courthouse to view the trial from the overflow room was raised during trial.

During the trial, a juror seated in the back row of the gallery indicated that he could not clearly see the text of an exhibit published by the Government on the monitor in the front of the gallery.  *See* Trial Tr. (June 17, 2021 P.M.) at 117:20–118:1, ECF No. 156.  Shortly thereafter, the jury was excused for the day and the Court held a discussion with the parties and the courtroom technology specialist about how to address this issue.  *Id.* at 122:12–125:1. Ultimately, the courtroom technology specialist was able to set up an additional monitor closer to the juror to enable the juror to view the exhibits.  No other jurors indicated that they had difficulty seeing the exhibits clearly.

Defendant's trial lasted eight days.  On June 24, 2021, the jury announced its verdicts of guilty as to all three counts included in the Indictment.  *See* Trial Tr. (June 24, 2021 P.M.) at 3:21–4:11, ECF No. 164.  Defendant now seeks to overturn the jury's unanimous verdicts and obtain a new trial based on a litany of alleged shortcomings in the Court's technology—*none* of which

Defendant's counsel or Defendant  alerted the Court of or objected to before or during trial (except for the two described above).  Defendant contends that these technological "glitches"  deprived him of his Sixth Amendment right to a public trial.  Def.'s Mot. at 8, 11.

Subsequent to the filing of Defendant's Motion for a New Trial, the Court was alerted that counsel for both parties had contacted the courtroom technology specialist with questions about the District Court's technological capabilities and the protocols in place for Defendant's trial.  The Court held a status hearing on August 4, 2021.  *See* Minute Order (Aug. 5, 2021).  The Court noted that the courtroom technology specialist had explained to counsel for the Government that the audio for the public line and the Ceremonial Courtroom were the same—a fact previously indicated by the Court on the record, *see* Trial Tr. (June 14, 2021 A.M.) at 15:13–20, ECF No. 149, and noted by the Government in its Opposition to Defendant's Motion, *see* Gov.'s Opp'n at 4.  As the Court explained during the status hearing, after Defendant's counsel also contacted the courtroom technology specialist, the courtroom technology specialist realized that he was being included as part of the litigation on Defendant's Motion and contacted the Court.  *See* Hr'g Tr. (Aug. 4, 2021) at 3:4–24, ECF No. 165.  At the status hearing, the Court asked Defendant's counsel to indicate what information he was seeking from the courtroom technology specialist, to which he responded with an extensive list of information, phone records, and testimony, effectively requesting discovery from the District Court.  *See id.* at 6:17–21:3.  The Court indicated that it would take his requests under advisement.  *See* Minute Order (Aug. 5, 2021).

At the conclusion of the status hearing, the presiding judge escorted counsel for both parties to the same overflow courtroom that was used during Defendant's trial.  *See* Hr'g Tr. (Aug. 4, 2021) at 21:22–24, ECF No. 165.  Upon the Court's request, the District Court's courtroom technology specialist had set up the overflow courtroom to the same specifications that were used

during Defendant's trial, including the three monitors.  *Id.* at 9:7–9.  Photographs of that set-up are attached as Exhibit A to this Memorandum Opinion.

As detailed below, the Court shall cite and attach to this Memorandum Opinion certain records to refute the few specific instances of alleged errors cited by Defendant.  The Court shall not, however, permit Defendant's counsel to engage in a fishing expedition in an effort to substantiate his remaining vague and overbroad claims of technological shortcomings.

## II. DISCUSSION

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . public trial."  U.S. Const. amend. VI.  The Constitution's "requirement of a public trial is satisfied by the opportunity of members of the public and the press to attend the trial and to report what they have observed."  *Nixon v. Warner Commc'ns, Inc*., 435 U.S. 589, 610 (1978).  The Supreme Court has explained that "[t]he central aim of a criminal proceeding must be to try the accused fairly."  *Waller v. Georgia*, 467 U.S. 39, 46 (1984).  The right to a public trial is "one created for the benefit of the defendant."  *Id*. (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979)); *see also Presley v. Georgia*, 558 U.S. 209, 212 (2010) (explaining that the right to a public trial "is the right of the accused").  "In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury."  *Waller*, 467 U.S. at 46.  However, "the right to an open trial may give way in certain cases to other rights or interests[.]"  *Id.* at 45.

The gravamen of Defendant's argument is that the Court failed to "accommodate the public" at his trial, Def.'s Reply at 5–6, because the "teleconference phone line was regularly inoperative or less than fully functional," Def.'s Mot. at 1, and because the overflow courtroom

provided insufficient public access, Def.'s Reply at 2–3.  The Court shall address each of these claims in detail, but first shall discuss the parties' dispute about the appropriate legal standard.

### A.  Legal Framework

The parties disagree about the correct legal standard to apply to Defendant's Motion for a New Trial.  The Government argues that Defendant's Motion should be analyzed under Federal Rule of Criminal Procedure 33, pursuant to which the Court may "vacate any judgment and grant a new trial if the interest of justice so requires."  Gov.'s Opp'n at 1 (quoting Fed. R. Crim. P. 33).  To obtain a new trial under Rule 33, "the evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand."  *United States v. Howard*, 245 F. Supp. 2d 24, 30 (D.D.C. 2003) (quoting *United States v. Edmond*, 765 F. Supp. 1112, 1118 (D.D.C. 1991) (additional citations omitted)).  In making its determination, the district court considers whether "a serious miscarriage of justice may have occurred."  *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990) (quoting *Tibbs v. Florida*, 457 U.S. 31, 38 n.11 (1982)).  Although trial courts enjoy "broad discretion" in deciding whether to grant a new trial, *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014), this "power should be exercised with caution, and is invoked only in those exceptional cases in which the evidence weighs heavily against the verdict," *Edmond*, 765 F. Supp. at 1118.  It is the defendant's burden to "overcome [the] strong presumption . . . in favor of upholding the jury verdict[.]"  *Rogers*, 918 F.2d at 213 (internal citation and quotation marks omitted).  The Government argues that Defendant's Motion fails under this standard because he has offered no evidence or argument that "the integrity of the verdict has been called into question[.]"  Gov.'s Opp'n at 7.

Defendant, in his Reply, counters that this "generic standard for a new trial" does not apply to his motion and that he is not required to "demonstrate that the integrity of the jury verdict [was]

called into question." Def.'s Reply at 4. Instead, Defendant contends that the Court should apply the test articulated by the Supreme Court in *Waller v. Georgia*, pursuant to which the "party seeking to close the hearing" must (1) "advance an overriding interest that is likely to be prejudiced"; (2) that the closure is "no broader than necessary to protect that interest"; (3) the trial court "consider[ed] reasonable alternatives to closing the proceedings"; and (4) "makes findings adequate to support the closure." 467 U.S. at 48. Defendant contends that the Court failed to make these findings before "closing" the Courtroom, and therefore his right to a public trial was violated. *See* Def.'s Mot. at 5–9.

But by asking the Court to apply the *Waller* standard, Defendant has omitted a crucial initial step. He must first demonstrate that a "complete closure" of the trial occurred. *See United States v. Perry*, 479 F.3d 885, 889–90 (D.C. Cir. 2007) (reciting the *Waller* test to assess if the "*complete* closing of a criminal proceeding is constitutional" (emphasis added)). But, as detailed *infra* Section II(B), Defendant has failed to establish as a factual matter that there was ever any "complete closure" of the proceedings triggering analysis of the *Waller* factors. *Perry*, 479 F.3d at 889–90.

Moreover, as the D.C. Circuit has explained, even if a criminal proceeding is closed, certain closures can be "too trivial to be a violation of the Sixth Amendment." *Perry*, 479 F.3d. at 889–90. Adopting the "triviality standard" articulated by the Second Circuit in *Peterson v. Williams*, 85 F.3d 39 (2d Cir. 1996), the D.C. Circuit has explained:

> A triviality standard, properly understood, does not dismiss a defendant's claim on the grounds that the defendant was guilty anyway or that he did not suffer "prejudice" or "specific injury" . . . It looks, rather, to whether *the actions of the court and the effect that they had on the conduct of the trial deprived the defendant—whether otherwise innocent or guilty—of the protections conferred by the Sixth Amendment.*

17

*Perry*, 479 F.3d at 890 (emphasis added) (quoting *Peterson*, 85 F.3d at 42).  In other words, a courtroom closing is "trivial"—and therefore *not* a violation of the Sixth Amendment—if it does not implicate the "values served by the Sixth Amendment," which are: "(1) to ensure a fair trial; (2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; (3) to encourage witnesses to come forward; and (4) to discourage perjury." *Peterson*, 85 F.3d at 43(citing *Waller*, 467 U.S. at 46–47); *see also Perry*, 479 F.3d at 889–91 "[T]he question of whether a particular closure implicates the Sixth Amendment turns on whether it undermines the values the Amendment is aimed to protect."  *Carson v. Fischer*, 421 F.3d 83, 92–93 (2d Cir. 2005).

This method of assessing whether any alleged closure is "trivial" differs from the ordinary analysis of a motion for a new trial under Rule 33, which requires that the defendant demonstrate that a "serious miscarriage of justice" calls the integrity of the verdict into question.  Under either standard, however, the Court finds that Defendant has failed to demonstrate that he is entitled to a new trial.

### B. Defendant Fails to Demonstrate Any Deprivation of His Sixth Amendment Right to a Public Trial.

Generally speaking, Defendant argues that he was deprived of a public trial because the Courthouse was closed which limited access to the overflow courtroom, and because the "public telephone line was inconsistent and had glitches[.]"  Def.'s Reply at 2–3.  Because many of Defendant's claims rely on non-specific, inaccurate, or, in some cases, misleading factual premises, the Court shall review each of his factual claims in detail.

Before doing so, the Court notes that Defendant initially challenged only the Court's "failure to maintain a reliable public telephone line" as the basis for his motion for a new trial, citing several alleged examples of the line being closed or not adequately capturing the proceedings

18

in the Courtroom.  *See* Def.'s Mot. at 1–10.  The Court shall address each—principally to correct certain mischaracterizations of the record.  But first the Court shall address the issues regarding the accessibility and sufficiency of the overflow courtroom, raised by Defendant in his Reply.  *See* Def.'s Reply at 2–3.

### 1.   Access to the Overflow Courtroom.

In his opening brief, Defendant acknowledges that the Court "granted access to [Defendant's] family and friends by providing an 'overflow' room where proceedings were broadcast through closed circuit television."  Def.'s Mot. at 2.  Despite this concession, he claims that "because there was no open access to the courthouse, the overflow room was insufficient to address the public access problem."  *Id.*  Notably, Defendant *never* made *any* objection to this arrangement before or during the trial—despite being put on notice by the Court that spectators (including family members) would not be permitted in the trial courtroom *and* despite clear directives in publicly available standing orders and other resources provided by the District Court. *See, e.g.*, Hr'g Tr. (June 7, 2021) at 4:18–24, ECF No. 114 ("[F]rankly with COVID, you're not going to have anybody sitting in the courtroom.  The place where they're going to be is an overflow courtroom for the media, if they're interested, or *anybody else who wants to watch*." (emphasis added)); Standing Order No. 21-20 at 4 ("[A]s space permits, consistent with health and safety measures, limited numbers of members of the public may be granted entry to the Courthouse for the purpose of observing live video feeds of ongoing trials from dedicated courtrooms or other spaces."); COOP Plan, App'x 8 ¶ (2)(a) (noting that "[a]dditional courtrooms will be designated . . . to allow limited numbers of members of the public and media to observe trial proceedings via a video feed at the discretion of the presiding Judge.").

Defendant has not provided *any* evidence suggesting that any person who wanted to observe his trial from the overflow courtroom was denied access.  Rather, in each of the affidavits submitted by Defendant in support of his motion, the affiant indicates that he or she was granted access to the Courthouse to view the trial from the overflow courtroom.  *See* Def.'s Reply Ex. A, Affidavit of Brittany Arthur ("Arthur Aff.") ¶¶ 7, 8, ECF No. 147-1; Def.'s Reply Ex. B, Affidavit of Alexandre Jabor ("Jabor Aff.") ¶¶ 7–9, ECF No. 147-2; Def.'s Reply, Ex. C, Affidavit of Ella Gantman ("Gantman Aff.") ¶¶ 5, 7, 8, ECF No. 147-3; Def.'s Reply Ex. D, Affidavit of Janelle Barrow ("Barrow Aff.") ¶¶ 4–6, 18, ECF No. 147-4; Def.'s Reply Ex. F, Affidavit of Michael St. Laurent ("St. Laurent Aff.") ¶¶ 3–8, ECF No. 147-6.  Although several of these affiants recount "difficulties" entering the Courthouse—*e.g.*, waiting in line to pass through security,[25] St. Laurent Aff. ¶ 4; being asked about their business in the Courthouse by security officers, Gantman Aff. ¶ 8; or observing confusion among Courthouse security about whether an individual's name was on "the list," *see* Arthur Aff. ¶ 5; Jabor Aff. ¶ 5; Barrow Aff. ¶ 6—*none* of them indicate that they were denied access to the Courthouse or the overflow courtroom.  Defendant has failed to establish that anyone who wanted access to the overflow courtroom to observe his trial was turned away.[26]

The overflow courtroom alone would have been sufficient to guarantee Defendant the safeguards of "ensuring that judge and prosecutor carry out their duties responsibly,"

---

[25] Courthouse entrants are *always* required to pass through a security screening—even when there are no access restrictions in place.  At peak hours, it is not uncommon for lines to form.

[26] Defendant also indicates that he was advised that there was a "limitation to how many people the overflow courtroom could hold."  Def.'s Reply at 3.  He never indicates, however, that the overflow courtroom ever reached its capacity (or came close to it); or that more people than would fit in the courtroom sought to gain access to it.  Had Defendant raised any issue of the overflow courtroom nearing capacity—which he did not—the Court could have considered alternative arrangements (*i.e.*, an additional overflow room).

"encourag[ing] witnesses to come forward," and "discourag[ing] perjury." *Waller*, 467 U.S. at 46. Defendant fails to offer any arguments or evidence otherwise.

Instead, Defendant proffers non-specific and, in some cases, misleading, claims about the set-up and operation of the overflow courtroom, arguing that these issues left observers with a less-than-perfect view of the trial. *See, e.g.*, Def.'s Reply at 3. But these arguments ignore that "the Sixth Amendment right to a public trial is for the protection of *the accused*." *Braun v. Powell*, 227 F.3d 908, 917 (7th Cir. 2000) (citing *Waller*, 467 U.S. at 46; *Estes v. State of Texas*, 381 U.S. 532, 538 (1965)) (emphasis added). Defendant never contends, for example, that any purported "insufficiencies" with the overflow courtroom affected the conduct of the Government, the Court, or the jury during the trial. Nor could he, as he provides *no* indication that any of these trial participants were aware of the issues he now complains of, that these issues had any influence on the conduct of the Government, the presiding judge, the witnesses, or the jurors, or that they affected the verdicts. Simply put, "[t]here is no reason to believe that [the defendant's] trial was any less fair, or that the court officers or witnesses took their roles any less seriously[.]" *Id.* at 919.

Notably, Defendant made *no* objection to the set-up of the overflow courtroom before or during trial. He also raised *no* issues with the functioning of the overflow courtroom to the Court during trial—with the exception of the audio issue during the general questioning of the first venire panel on the first morning of trial, which was immediately resolved by the courtroom technology specialist (who was alerted to the issue because he was in the overflow courtroom) while the Court paused proceedings. *See* Trial Tr. (June 14, 2021 A.M.) at 9:17–10:13, ECF No. 149.

Defendant first claims that the overflow courtroom had "limited video access – individuals could see the judge, the attorneys and the witness but not the exhibits or the triers of fact." Def.'s Reply at 3. He cites no legal authority indicating that the Sixth Amendment requires every

spectator to have a view of every angle of the Courtroom.  As a practical matter, a spectator viewing a trial from the courtroom gallery would not have a perfect sight line of each angle of the courtroom—let alone each individual juror.  Putting that aside, Defendant again fails to cite any precise time when he raised any of these issues with the Court *or* any time when *anyone* in the overflow courtroom raised *any* issue with the courtroom technology specialist, who spent substantial time monitoring the video and audio feeds from the overflow courtroom.  Presumably, Defendant and his counsel interacted with several of the individuals who attest that they viewed the trial from the overflow courtroom during breaks in the trial or after hours.  For example, there were at least two Federal Public Defender interns who assert that they watched some unspecified portion of the trial from the overflow courtroom.  *See* Gantman Aff. ¶ 5; Jabor Aff. ¶¶ 9–11.  In addition, Defendant's wife was present "daily" in the overflow courtroom and claims there were issues on a consistent basis and that she "could not see or hear any part of the proceedings." Barrow Aff. ¶ 11.  She knew the identity of the courtroom technology specialist, who was also "daily" present in the overflow courtroom for the purpose of monitoring the video and audio feeds, except for the day of the verdicts.  The courtroom technology specialist set up the video and audio systems of both the Courtroom and the overflow courtroom before the presiding judge took the bench each morning.  The courtroom technology specialist did not encounter such consistent and "daily" interruptions.  Nor were any of these alleged issues raised with the Court.

In any event, many of the claims in Defendant's Motion and the supporting affidavits are not entirely accurate.  One affiant, for example, (under oath) described the television screen in the overflow courtroom as "tiny."  Gantman Aff. ¶ 5.  It is difficult for the Court to fathom how that can be an appropriate characterization of a 50-inch television monitor, and two additional 15-inch monitors.  Another affiant (under oath) indicated that he "could not see any of the exhibits" on the

screens in the overflow courtroom.[27]   Jabor Aff. ¶ 10. But the split-screen video display on the
monitors in the overflow courtroom included a quadrant to display any exhibits that were published
to the jury.[28]   And even if it did not, "it is common practice for a court to receive exhibits during
trial without having them 'passed around to the spectators in the courtroom,'" *United States v.
Boyle*, 700 F.3d 1138, 1144–45 (8th Cir. 2012) (quoting *D'Aquino v. United States,* 192 F.2d 338,
365 (9th Cir. 1951)), "or otherwise ensuring that documents are 'simultaneously displayed to the
public,'" *id.* (quoting *United States v. Lnu,* 575 F.3d 298, 307 (3d Cir. 2009).   There is "no
authority suggesting that such a practice is unconstitutional."  *Lnu*, 575 F.3d at 307.

    In sum, the overflow courtroom was configured to allow members of the public who
wanted to attend the trial to do so—even amid a grave public health emergency requiring access
to the Courthouse to be restricted.  Defendant fails to demonstrate that the overflow courtroom
was ever "closed," or that any of the insufficiencies alleged deprived him of a fair, public trial.

### 2.   Delivery of the Verdicts.

    Defendant also contends that two issues during the reading of the verdicts deprived him of
a right to a public trial: first, that certain observers could not hear the verdicts or the polling of the
jury; and second, that his wife was not permitted to sit in the well of the courtroom when the
verdicts were delivered.  *See* Def.'s Mot. at 4, 11.  The Court finds that neither claim amounts to

---

[27] During the August 4, 2021 status hearing, Defendant's counsel suggested that this affiant was
referring to exhibits displayed during closing arguments, *see* Hr'g Tr. (Aug. 4, 2021) at 12:6–10,
ECF No. 165, which is not clear from the affidavit.  Jabor Aff. ¶ 10 (stating that, at an unspecified
date and time, "I could not see any of the exhibits[.]").  If that is the case, then the exhibits at issue
would have included only those that had been previously admitted and discussed during testimony
*or* demonstrative exhibits, which of course are not evidence in the case.

[28] This bottom right quadrant in Image 2 of Exhibit A would have displayed the same exhibits that
were published to the jury, regardless of whether those exhibits were presented on a laptop or on
the projector.

a "closure" of the trial, and that even if they did, neither implicated Defendant's Sixth Amendment right.  Before assessing these claims, the Court shall briefly provide some factual context.

Before the jury entered the Courtroom to deliver the verdicts, Defendant's counsel requested that "Mr. Barrow's wife be allowed to be in the courtroom" for the verdicts.  Trial Tr. (June 24, 2021 P.M.) at 2:16–18, ECF No. 164.  Given the distancing protocols in place throughout the course of trial, the Court noted that the only place Defendant's wife could go would be in the "well of the court." *Id.* at 2:19–21.  The Court declined to allow Defendant's wife to be in the well of the court—that would be an extraordinary measure even absent the stringent health and safety protocols in place.  Instead, the Court noted that Defendant's wife could watch from the overflow courtroom, and "as soon as we get the verdict, we will excuse [the jury], and I have no problem with her coming in at that point." *Id.* at 2:24–3:2.  Defendant's counsel did not object to the Court's proposal. *Id.* at 3:2.  The Court's decision was entirely consistent with the District Court's standing orders and COOP Plan.  *See supra* Section I.

During the announcement of the verdicts, the jurors sat distanced in the gallery of the courtroom.  The foreperson was provided with a handheld microphone that was turned on to deliver the verdicts. *See* Trial Tr. (June 24, 2021 P.M.) at 2:8–11; 3:6–12, ECF No. 164.  Although the foreperson had a soft voice, he was plainly audible in the Courtroom, as the court reporter captured the delivery of the verdicts of guilty as to all three counts without any interruption, indicating that the court reporter in the well of the Courtroom could hear the foreperson, who was in the back of the gallery.[29] *Id.* at 3:17–4:11.  Upon request of Defendant's counsel, the Court then polled the jurors to confirm that each agreed with the verdicts as stated by the foreperson. *Id.* at 4:18–6:22.

---

[29] Court reporters are instructed to interrupt if they are not able to hear any part of a proceeding, to ensure that there is a complete record.

The handheld microphone was passed around the gallery to each juror, and, again, the responses were audible in the Courtroom.  *Id.*

Defendant argues that his right to a public trial was violated because the "public line was unable to capture the jury foreperson's voice when he announced the verdict" and because some spectators in the overflow courtroom could not hear the foreperson.  Def.'s Mot. at 4–5; *see* Jabor Aff. ¶ 12; Gantman Aff. ¶ 7; Def.'s Reply Ex. E, Affidavit of Kimberly Ann Johnson ("Johnson Aff.") ¶ 12, ECF No. 147-5.  The Government, however, submitted an affidavit of Special Agent Peter Kirby, who indicates that he "could see and hear proceedings in [the overflow courtroom] when the verdict was read and the jury was polled by the live audio and video feed that was available," but also notes that "the foreperson's voice and the voice of some of the jurors when they were polled was difficult to hear."  Gov.'s Opp'n Ex. 3, Affidavit of Special Agent Peter Kirby ("Kirby Aff.") ¶¶ 4–5, ECF No. 146-3.  Based on the evidence submitted by both parties, it appears that the audio and video into the overflow courtroom were functioning at the time the foreperson read the verdicts and the Court polled the jury, but the audio may have been more difficult for some to hear than for others.  Defendant fails to demonstrate or cite any legal authority demonstrating how this equates to a "closure" of the trial.

Even assuming that the inability of certain members of the public to hear the announcement of the verdicts amounted to a "closure" of the trial, Defendant still fails to demonstrate any implication on the values underlying the Sixth Amendment right to a public trial.  His argument rests on the conclusory assertion—without citation to any legal authority—that he "did not suffer a 'trivial' violation" because the jury's announcement of its verdict is "perhaps the most critical proceeding of all."  Def.'s Mot. at 10.  But the "triviality" of a closure requires consideration of whether the closure implicates the values underlying the Sixth Amendment— "(1) to ensure a fair

trial; (2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; (3) to encourage witnesses to come forward; and (4) to discourage perjury." *Peterson*, 85 F.3d at 43; *see also Perry*, 479 F.3d at 890–91.

Here, the values underlying the Sixth Amendment were not implicated by the inability of certain (but not all) spectators in the overflow courtroom to hear the verdicts. The third and fourth values were plainly not implicated, as the evidentiary phase of the trial had concluded. *See, e.g.*, *United States v. Lipscomb*, 539 F.3d 32, 43 (1st Cir. 2008) (finding no violation of defendant's right to a public trial when someone was locked out of the courtroom during closing arguments because the defendant "does not purport to show that the alleged closure was intentional or that it occurred during the evidentiary phase of the trial"). The first and second values were also not implicated, because there is no reason to believe that Defendant's trial was any less fair or that the prosecutors and judge took their roles any less seriously when the foreperson delivered the verdicts. Defendant does not argue otherwise. In fact, nothing on the record suggests that anyone in the Courtroom *knew* of any audio issues in the overflow courtroom when the verdicts were read. None of the "actions of the court" or the "effect that they had" on the foreperson's reading of the verdicts undermined the protections afforded to Defendant by the Sixth Amendment. *Peterson*, 85 F.3d at 42.

Moreover, the trial was not closed to Defendant's wife during the announcement of the verdicts. The Court specifically noted that Defendant's wife could watch the announcement of the verdicts from the overflow courtroom, which was consistent with the applicable standing orders and associated COVID-19 protocols in place throughout the trial. The Court's decision not to permit her to stand or sit in the well of the Court did not violate Defendant's right to a public trial.

### 3.   Discussion of Jury Instructions and Jury Notes.

Next, Defendant claims that his trial was closed during discussions between counsel and the Court about jury instructions and jury notes on June 24, 2021.  First, he contends that the Court "prevented the Deputy Clerk from activating the public phone line on June 24[,]" which "left the public unable to listen to the proceedings where jury instructions were discussed."  Def.'s Mot. at 10.  And second, he claims that the public "was not notified" before the Court discussed responses to two jury notes with the parties, and therefore the public "could not call in."  *Id.* at 3.  Both arguments fail at the outset because Defendant has provided no evidence suggesting that the overflow courtroom was also closed at either time.  Nonetheless, the Court provides some additional information about both claims.

The Court had instructed the parties to arrive early, at 8:30 a.m., on June 24, 2021 to discuss outstanding issues relating to two jury instructions, which were addressed by the parties and the Court in email correspondence the night before and are part of the public record.  *See* Trial Tr. (June 24, 2021 A.M.) at 3:11–15, 3:20–5:17, ECF No. 163; Order, App'x at 3–4, ECF No. 142-1. When the presiding judge arrived in the Courtroom, the Courtroom Deputy Clerk was dialing in to the public telephone line on speaker phone, and the Court instructed "We'll wait until after we get started to do that, [Courtroom Deputy Clerk].  I want to get moving."  Trial Tr. (June 24, 2021 A.M.) at 3:18–19, ECF No. 163.  Though admittedly less than clear, the Court intended that the Courtroom Deputy Clerk proceed to open the line using the phone's handset rather than the speaker so as not to disrupt the discussion.  And that is what the Courtroom Deputy Clerk did.  The Court gave that instruction to the Courtroom Deputy Clerk at 8:43 a.m. and the transcript confirms that

the public line was open as of 8:56 a.m.[30]  *See* Ex. B, Excerpts of Trial Transcript (June 24, 2021 A.M.) with Time Stamps, at 10:18–21 (The Court: "Is the phone working?" The Courtroom Deputy: "Yes.").

On the same day, the Court received two notes from the jury during its deliberations.  *See* Trial Tr. (June 24, 2021 A.M.) at 61:12–65:1, 65:13–68:12, ECF No. 163.  Defendant contends that the "public had no way of knowing when court would be in session during deliberations" and "was not notified" when "notes from the jury were addressed."  Def.'s Mot. at 3.  This argument is unavailing.  Even absent the COVID-19 protocols, the Court would not "notify" members of the public when jury notes were being discussed by the parties.  And, in any event, the public phone line was open as of 8:56 a.m. on that day, as indicated above.  Defendant has not provided any specific evidence supporting his speculative claim that the public "could not call in" during the times the jury notes were discussed.  Def.'s Mot. at 3.

Defendant fails to demonstrate that his trial was "closed" for the minutes between the beginning of the Court's discussion with the parties about jury instructions and the opening of the public line, or during the discussions about responses to jury notes.  He does not contest that the overflow courtroom was available during both time periods, allowing members of his family and other attendees to observe the discussions.  Even if the overflow courtroom had not been available, courts have routinely concluded that "closures" of brief durations are "trivial," and do not implicate a defendant's Sixth Amendment right to a public trial.  *See, e.g.*, *Snyder v. Coiner*, 510 F.2d 224, 230 (4th Cir. 1975) ("Such condition existed for but a short time . . . The incident was entirely too trivial to amount to a constitutional deprivation."); *United States v. Al-Smadi*, 15 F.3d 153, 154–

---

[30] During the status hearing on August 4, 2021, the Court misstated the time at which the public line was open.  The trial transcript unambiguously provides the time at which the Courtroom Deputy Clerk confirmed that the public line was open.  Ex. B at 10:18–21.

55 (10th Cir. 1994) (concluding that exclusion of defendant's family members for twenty minutes due to the court's failure to keep courthouse doors unlocked after normal operating hours did not violate Sixth Amendment).  That is particularly true where, as here, the discussions addressed only logistical matters (e.g., how the jury could view exhibits electronically while deliberating, Ex. B at 5:18–7:18 and the timing of the jury's lunch break, *id.* at 7:19–9:8) and legal issue underlying two specific jury instructions and jury notes, *id.* at 3:20–5:17; 61:12–65:1, 65:13–68:12.  "Non-public exchanges between counsel and the court on such technical legal issues and routine administrative problems do not hinder the objectives which the Court in *Waller* observed were fostered by public trials."  *United States v. Norris*, 780 F.2d 1207, 1210 (5th Cir. 1986).

In sum, Defendant's contention that the Court's failure to open the public telephone line for a brief period during a discussion of jury instructions and failure to "notify" the public when it would discuss jury notes violated his right to a public trial fails because neither constituted a "closure" of the trial (the overflow courtroom was open) and, even if it did, both discussions were brief in duration and involved legal or administrative matters that did not implicate the values underlying his constitutional guarantee to a public trial.

### 4.  Audio During Second Venire Panel.

Defendant further claims that "on the third day of voir dire, when the Court read the initial questions to the second set of jurors, the audio again gave out.  This came to the court's attention only after Defendant was alerted by an individual who had been listening to the feed."  Def.'s Mot. at 2.  The transcript provides *no* example of *any* issues with the audio during the general questioning of the second venire panel, *see* Trial Tr. (June 16, 2021 A.M.) at 51:2–82:25, ECF No. 153, in stark contrast with the technological issues raised during the first venire panel (which caused the Court to pause questioning), *see* Trial Tr. (June 14, 2021 A.M.) at 9:17–10:13, ECF

No. 149.   Nor does it provide *any* indication that any issue at the time alleged "came to the court's attention." *Id.* Defendant's claim is entirely unsupported by the record; he fails to demonstrate that the trial was closed during group questioning of the second venire panel.[31]

### 5.   Additional Claims About the Public Telephone Line.

Finally, Defendant raises several non-specific and speculative claims about the functioning of the public telephone line.  He claims, for example, that certain individuals "were either removed from the line or were unable to call in."  Def.'s Mot. at 4; *see, e.g.*, Arthur Aff. ¶¶ 12–15 (affiant who dialed in "once" while "driving" was "disconnected" and "unable to connect for several minutes"); Barrow Aff. ¶¶ 12–13 (indicating that she "listened to the court proceedings on the telephone once" and was "disconnected" for "1-2 minutes"); Johnson Aff. ¶¶ 7–8 (indicating that she was "disconnected on a daily basis" and there "were times I could not connect for approximately 15 minutes.").  He further contends that the audio on public line was not always clear or that it was sometimes difficult to hear witnesses, the judge, or the prosecutors.[32]  *See, e.g.*, Arthur Aff. ¶¶ 12–14 (affiant who dialed in "once" while "driving," "had a difficult time" hearing the public line); Gantman Aff. ¶ 4 (affiant who "called in once" recalls "the audio quality was

---

[31] The Court notes that, in light of the need to divide the panel of prospective jurors into two groups to ensure adequate distancing, it read *the exact same questions* twice.

[32] As one affiant observed, "There were moments where lawyers and witnesses would not speak into the microphone directly, so the audio or what they were saying was not picked up."  Jabor Aff. ¶ 14.  This problem is not unique to trials proceeding under the COVID-19 protocols, and the Court has identified *no* legal authority (nor has Defendant provided any) that the failure of counsel or witnesses to speak directly into a microphone deprives a criminal defendant of a right to a public trial.  Moreover, the Court *constantly* admonished prospective jurors during voir dire, attorneys and witnesses alike to speak directly into the microphones. *See, e.g.*, Trial Tr. (June 17, 2021 A.M.) at 107:16–17, ECF No. 155 (instructing Defendant's counsel, "You need to be in front of the microphone.").  The Court also instructed the jurors to alert the Court if they could not hear someone speaking.  *See id.* at 45:23–46:6.  And the court reporter also interjected if she could not hear someone speaking.  *See, e.g., id.* at 93:13–15 (indicating to Defendant's counsel: "I'm sorry, counsel.  Could you please stand by the microphone?  I'm having trouble hearing you.").

poor"); Johnson Aff. ¶ 5 (describing the audio quality as "awful"); St. Laurent Aff. ¶ 14 ("I had

[a] difficult time hearing. I couldn't always hear what the witness or anyone else was saying.").

Defendant assumes that these issues are attributable to problems with the Court's public telephone

line, as opposed to the callers' service or phone. *See, e.g.*, Arthur Aff. ¶¶ 12–14 (noting difficulties

hearing the public line while "driving").

      As the Court has previously noted, the overflow courtroom alone provided sufficient public

access to Defendant's trial. But even if the alleged malfunctions prevented certain members of the

public from listening to the trial at certain points, the descriptions provided by Defendant amount

to no more that the "brief" and "inadvertent" closures routinely rejected by courts as a basis for a

Sixth Amendment violation. *See, e.g.*, *Peterson*, 85 F.3d at 43 (closure that was "extremely short"

and "entirely inadvertent" did not implicate Sixth Amendment); *Al-Smadi,* 15 F.3d at 154–55

(closure that was "brief and inadvertent" and "unnoticed by any of the trial participants" did not

violate the Sixth Amendment). Defendant has failed to demonstrate that the purported difficulties

with the public phone line amounted to a closure of his trial or implicated his Sixth Amendment

right.

### C. Defendant is Not Entitled to Discovery from the Court or an Evidentiary Hearing.

      In his Motion, Defendant requests that the Court hold an evidentiary hearing to "establish

important facts about what happened at trial" and to "determine the scope of the [public telephone

line's] failure." Def.'s Mot. at 4. Moreover, Defendant's counsel requested during the August 4,

2021 status hearing extensive discovery from the District Court. *See* Hr'g Tr. (Aug. 4, 2021) at

6:17–21:3, ECF No. 165.

      The District Court and its staff are not parties to this case. The Court has provided with

this Memorandum the records it considers necessary to correct certain inaccurate claims made in

Defendant's Motion, but declines to provide the additional records and testimony requested by Defendant.  Defendant has elected to challenge the Court's efforts to provide the public access to his trial in the middle of a public health emergency.  The Court declines to allow him to engage in a fishing expedition to get a second bite at substantiating these claims, which are presently generalized, bare of specific facts, misleading in some cases, and inaccurate in other instances.

### III.   CONCLUSION

As Defendant quotes in his Reply, "Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials."  Def.'s Reply at 5 (quoting *Presley v. Georgia*, 558 U.S. 209, 215 (2010)).   Defendant's Motion fails because the Court *did* accommodate the public at his trial.  The measures taken by the District Court to ensure that the public could safely attend Defendant's trial during a global pandemic and public health emergency were more than reasonable.  This Court carefully adhered to those policies, providing the public access to the trial through an overflow courtroom and a public telephone line.  Defendant has failed to show that the Court's efforts were unreasonable, that his right to a public trial was undermined, or that there is any doubt about the fairness of the verdicts. Accordingly, for the foregoing reasons, Defendant's [143] Motion for a New Trial is **DENIED.**

An appropriate Order accompanies this Memorandum Opinion.

/S/
COLLEEN KOLLAR-KOTELLY
United States District Judge

Date: August 13, 2021